### THE JOSEPH W. FORDNEY et al.

(District Court, E. D. New York. December 14, 1911.)

SHIPPING (§ 86*)—SINKING OF LIGHTER—NEGLIGENCE IN LOADING—UNSEA-
    WORTHINESS.

    The sinking of a canal boat used as a lighter in discharging a cargo of sulphur from a steamship after she had been partially loaded forward at night, she having a large opening in the forward part of her hull when found in the morning, *held* not shown by the evidence to have been due to any negligence of the steamship or stevedores which rendered them liable for the loss, but probably due to her unseaworthiness for the service on account of her age, which was known to her owner when he let her for the work.

    [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 357; Dec. Dig. § 86.*]

In Admiralty. Suit by Henry Bartholomew, owner of the canal boat C. W. Woodford, against the steamship Joseph W. Fordney and John J. Brady and Michael Gioe. Decree for respondents.

Stephen Callaghan, for libelant.

Convers & Kirlin (John M. Woolsey and George A. Washington, of counsel), for respondents.

CHATFIELD, District Judge. The Woodford, an old canal boat, had been bought by the libelant in the year 1908 for $350. Her age was estimated at from 20 to 22 years, and she was repaired soon after the purchase by the libelant. But these repairs do not seem to have remedied the conditions shown by the accident in question, which occurred upon the night of October 20, 1909.

The libelant was the owner of another canal boat, and both boats

---

had been hired for carrying a cargo of sulphur from the steamer Joseph W. Fordney, which was moored at a dock in the Erie Basin, and from which the respondents Brady and Gioe were lightering the cargo of sulphur, with the use of the steamer's winches. A number of boats were loaded during the afternoon of October 20th, and among them the Tyler, upon which the libelant himself acted as captain. The stevedores ran the sulphur from chutes projecting out of a bridge at the level of the steamer's deck. The sulphur was carried in wheelbarrows, poured into hoppers, and then let down through these chutes by slides operated by a man at the hopper. The sulphur was directed into the hatch of the canal boat some 20 feet below by turning the chutes as might be necessary. The canal boat moved back and forth to bring the various hatches under the chute.

The libelant claims that at about 10:45 p. m. he had gone upon the Woodford, which was then to be taken under the chutes (the work being done by electric light from the dock not far away), and that he forbade the stevedores to load the Woodford that night; that he was then assaulted, his life threatened; and (the tow line with which he was pulling the Woodford into position having been forcibly taken away from him by the foreman of the stevedores) that he proceeded to shore and to his other boat, where he remained until the following morning. His daughters, who had been theretofore sleeping upon the Woodford, left the boat with some of their belongings before the loading began. No insurance was carried upon the Woodford, although the Tyler was insured.

A man known as York, described by the libelant and his witnesses as an old man, with a reddish mustache, crippled in some manner, and who is reported to have been killed by the cars some time during the summer of 1910, was left upon the Woodford. The libelant testifies that soon after he left the Woodford this man York also came on board the Tyler and slept, as the libelant says, from fear of the stevedores. The Woodford was taken under the chutes apparently while the man York was on board. The loading went on until 12 o'clock midnight, and some 29 tons of sulphur are shown by the weigher's books to have been placed in her two forward hatches; there being no sulphur in the two after hatches. The next morning the bow of the Woodford was resting upon the bottom of the Basin, her stern floating and with a part of the cabin out of water, a lighted lamp still remaining burning in the bracket upon the cabin wall. Some attempt was made to move the boat, but she was so firmly aground that this effort resulted only in starting a part of her rail. She was then left until raised by a derrick, when it was found that a large opening of some sort could be located along the bilge log upon one side near the bow. Slings were fastened around the sunken end, and, after being partially raised, she was towed in a submerged condition to the Elysian Fields, a mud flat on the Jersey shore, where she was left at high tide, and has remained until the present.

A considerable issue developed on the trial as to the exact location and character of the break which all of the witnesses found, but which they located in different places and ascribed to different causes. But

the result of this testimony only makes it seem to be proven that the wood of the boat was not decayed to such an extent as to be apparently rotten from outside observation, and that the bolts or spikes, with which the bottom planks and bilge log were fastened, were in a more or less rusted condition. The opening, wherever it occurred, was due to the strain of the load of sulphur, increased by the collection of water in the loaded end, and whether or not the actual sinking came from a sudden giving way as the load of sulphur was placed in the boat, or whether the giving way came from a gradual increase of weight by leakage, in addition to the sulphur, on either theory the libelant must be held responsible for having furnished an unseaworthy boat for the purpose of carrying a cargo of sulphur, unless such actual carelessness and negligence in the care of the boat and in the manner of loading is proven as to show that this was the proximate cause of the accident. They undertook to load her and to use reasonable precaution in so doing by insisting upon having the boat loaded at night, or by taking her under the chutes themselves. But, in the absence of warning, this is not equivalent to a waiver of the right to be given a seaworthy boat.

The libelant, according to his own story, was in an excited and nervous condition, even to the point of remaining upon his own boat and not going upon the dock throughout the entire night for fear of losing his life. The circumstances would not seem to justify such fear, but his recollection of the movements of other people must have been affected by the excitement under which he labored. If the barge sank suddenly before 12 o'clock, and the boy who had been trimming came and told the libelant of that fact, and in the meantime York, the man who had been working upon the barge, had come on board the Woodford, while the libelant's wife and daughters were all on the Woodford, it is incredible that they should have remained quiet after the stevedores left until morning, and that there is no other way of showing that the boat was actually sunk before midnight. The libelant's statement that, although he did not see the sinking, a boy came to him before 12 o'clock and told him, and that he then did nothing further, is not persuasive, in the face of all the other testimony.

The explanation of the libelant that the stevedores ceased work because the barge could not be moved after she had sunk, and that they could not move the steamship at night, might be plausible, if any evidence, either from the conduct of the stevedores or the other workmen or of the officers of the steamship, corroborated the claim. Such corroboration would seem easy if the fact existed, but, on the other hand, the testimony is all to the effect that the stevedores regularly stopped work at 12 o'clock. All of the witnesses connected with the steamer or with the stevedores testified that work was finished, the men went home in the usual manner, and that the weighing and loading of the sulphur, as shown by the weigher, stopped because work was done, and not because of any accident or interruption in the work. The only witnesses who would have been in a position to tell about the leakage or condition of the boat before 12 o'clock, if she was not sunk at that time, are York and the boy who was trimming upon the

boat. This boy has gone upon the stand and testified that, when he left her, the boat was leaking, but that her captain was on board and not making any effort to keep her afloat, but, on the contrary, was getting ready to leave.

A further mystery is added by the libelant's testimony that his man York was a short, stout man, old, and crippled, while the stevedore's witnesses describe him as considerably taller, somewhat younger, and showing ordinary capacity, with no evidence of being a cripple. The witnesses for the respondents all assert that the man they describe is the same man who was upon the boat all the time, and that he acted as captain, to the extent of assuming to take care of and handle the boat after the libelant left the boat, having objected to its being loaded at that time. In fact, the respondents show with considerable certainty that this man in charge of the Woodford was told that, unless he allowed them to use his boat, they would take another, and that he then went ahead and helped them to place the boat under the chutes. The identity and actions of this man, who it has been said died before the trial, raise the serious issue in this case. The libelant offered for use an old boat which did not stand the strain of loading in a manner which the witnesses testify a seaworthy boat should stand it. He had failed to take out insurance upon that boat. After some dispute and violent language he left the boat, and, when she did sink, he considered her not worth raising, abandoning her without any attempt to ascertain her condition beyond what could be seen from his other boat. He immediately started on the trip up the river with the other boat, and then brought an action against both the steamer and the stevedores, with allegations that the persons in charge of the steamer sent some one to assault him and take his boat away from his possession, that the missing boatman removed his effects from the boat, and the libelant's daughters were told by him to leave the boat.

The age of the boat and the small price for which he obtained her were known to the libelant, and from all these facts the respondents allege that the libelant has not borne the burden of proof so as to show his good faith, and so as to clear him from the accusation of having appreciated the risk which the boat ran, and arranged things in such a way that, if disaster occurred, the responsibility would seem to be upon some one else. We have, therefore, the charge of the libelant that a wanton, willful, and unnecessary assault and attempt to injure and improperly load his boat occurred on the part of the stevedores. Opposed to this, we have the charge on the part of the respondents that the libelant was intentionally arranging and carrying out a fraud, which he has now followed up by the libel action and testimony in court. Upon the trial, the testimony of the stevedores was given in such a manner, as evidenced by their readiness to answer all sorts of leading questions, that the court was forced to conclude that little further light could be obtained from their statements. But as to the essential points, and particularly as to the statement that they stopped work at midnight, and that the boat was afloat at that time, there is sufficient corroboration, and the evidence as to the manner of loading the boat is sufficient to rebut the charge of willful and inten-

tional attempt to injure the boat, or of reckless disregard in the manner of loading.

The libelant showed plainly upon the trial that his mental condition at the time of the accident was not such as to render his judgment dependable nor make his recollection exact; but his testimony was not, in spite of that, of a character to justify the respondents' idea that the whole proceeding was a deliberate plot upon his part. It would seem that the libelant reached the conclusions he did and acted as the testimony showed from an exaggerated and unnecessary sense of fear, rather than from intentional fraud. His ideas of negligence on the part of the stevedores, and the various actions indicating possible forethought on his part as to the sinking, are all explained by his mental condition at the time, and by the fact that he knew the boat was old and not capable of undergoing the risks which she might naturally incur. But, even with these explanations, the libelant has not met the burden of proof, and while he may not have deliberately intended to put his boat in a position where she was likely to be injured, with the idea of benefiting thereby, nevertheless, he does not make out a case of negligence on the part of the respondents. There is no evidence at all upon which to base the charge that the steamship or its officers did anything showing negligence, and they are not even responsible for the care of the boat or manner of loading, on the facts as they now appear.

The libel must be dismissed.